J-A11012-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| L.D.E. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| T.O. | : | |
| | : | |
| Appellant | : | No. 1757 MDA 2024 |

Appeal from the Order Dated November 15, 2024
In the Court of Common Pleas of York County Civil Division at No(s):
2022-FC-000547-03

BEFORE:   MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED: APRIL 29, 2025**

In this child custody action, T.O. (Father), the biological father of P.E.O. (Child or the Child), a son born in February 2011, appeals, *pro se*, from the trial court's order awarding L.D.E. (Mother)[1] sole legal custody and primary physical custody of Child, subject to Father's periods of partial, supervised physical custody.  After a painstaking review of Father's numerous claims, we affirm.

Prior to the parties' separation in 2019, they were in a relationship for over 20 years and had three children: Child; a son, T.O., Jr.; and a daughter,

---

[*] Former Justice specially assigned to the Superior Court.

[1] Mother also proceeds *pro se* on appeal, and has filed an appellee's brief.

P.O.[2]  Mother resides in York, Pennsylvania, where Child attends school while he is in Mother's custody.  N.T., 10/30/24, at 23, 59.  Father resides in the state of South Carolina.  *Id.* at 222.

Mother filed a custody complaint against Father on April 1, 2022, seeking sole physical and legal custody of Child.  Following a custody trial, the trial court entered a final custody order on September 23, 2022 (Original Custody Order).[3]  The Original Custody Order awarded the parties shared legal custody, and Mother primary physical custody of Child, subject to Father's periods of partial physical custody.[4]  Original Custody Order, 9/23/22, at 1-3 (unpaginated).  Neither party appealed the Original Custody Order.

On April 30, 2024, Father filed a *pro se* petition for modification of custody (Petition to Modify).  Father sought an award of primary physical

---

[2] We hereinafter refer to T.O., Jr., and P.O. as "Child's siblings."  Child's siblings are both adults and do not reside with either of the parties.

[3] The same judge who issued the Original Custody Order, the Honorable Joseph N. Gothie, subsequently issued the November 15, 2024, custody order that underlies the instant appeal.

[4] With respect to physical custody, the Original Custody Order provided that "Mother shall have primary physical custody throughout the school year…. Father shall have the majority of time over the summer and some long weekends[.]"  Trial Court Opinion, 9/23/22, at 2; Original Custody Order, 9/23/22, at 3 (unpaginated) (providing that during the majority of the summer, Child would reside with Father, and "Mother is entitled to the last 14 days of summer preceding the [C]hild's return to school in the fall[.]").  The Original Custody Order further required the parties to conduct custody exchanges at their respective residences.  Original Custody Order, 9/23/22, at 3-4 (unpaginated).

custody of Child, subject to Mother's periods of partial custody. Petition to Modify, 4/30/24, at 2.

On May 14, 2024, Mother filed a petition for contempt against Father.[5] Mother alleged that Father had violated several court orders, including provisions of the Original Custody Order. Petition for Contempt, 5/14/24, ¶¶ 4-9. Mother claimed Father, in violation of the Original Custody Order, 1) was "interfering with Mother's communication with the [C]hild"; and 2) "makes disparaging remarks about Mother when communicating with and/or around the [C]hild and encourages the [C]hild to speak negatively to and about Mother[.]" *Id.* ¶ 8(B); *see also* Original Custody Order, 9/23/22, at 4-5 (unpaginated) (provision directing the parties to "encourage and facilitate frequent communication [with] the Child," and "to be cordial and not make disparaging comments about the other parent[.]"). Mother further alleged Father had violated a court order to pay Mother's attorney's fees, entered following a prior contempt proceeding. Petition for Contempt, 5/14/24, ¶¶ 4-6.

The trial court explained the procedural history that ensued in its Pa.R.A.P. 1925(a) opinion:

> On August 2, 2024, Mother filed a petition for special relief and another petition for contempt, along with a notice of presentment of matter indicating Mother's desire to be heard on [these petitions] at [a scheduled] August 9, 2024, pretrial conference.

---

[5] Previously, Father had unsuccessfully filed a *pro se* petition for contempt against Mother. *See generally* Petition for Contempt, 8/14/23.

The latter matter related largely to Father's failure to make the Child available for return to Mother, when Mother travelled to South Carolina to pick the Child up prior to the start of the school year, as provided in the [Original] Custody Order.

Prior to conducting the pretrial conference on August 9, 2024,[6] the [trial] court addressed both Mother's contempt petition of August 2, 2024, and [Mother's] petition for special relief. The court also scheduled the trial on [Father's] Petition to Modify,[7] and to address the other aspects of [Mother's] prior petitions for contempt. An order was issued from the bench at the conclusion of the … [Pretrial H]earing.[8] Father appealed timely on August 22,

_____

[6] On August 9, 2024, the trial court held a joint pre-trial conference and contempt hearing (Pretrial Hearing), wherein Mother and Father were the only witnesses. Mother testified that Father, in violation of the terms of the Original Custody Order, failed to return Child to Mother's custody at the conclusion of Father's custodial period in July 2024. N.T., 8/9/24, at 36-37. Mother testified that she was forced to pay for airfare and a rental car to retrieve Child. *Id.* at 38. Mother offered receipts pertaining to her travel expenses into evidence, to support her claim of monetary damages resulting from Father's contempt. *Id.* at 54; Mother's Exhibits 1-3. The trial court admitted Mother's receipts, over Father's objection vaguely challenging the authenticity of the receipts. *Id.* at 54-55.

[7] In an order entered on August 9, 2024 (Scheduling Order), the trial court scheduled trial for October 18, 2024. Scheduling Order, 8/9/24, at 1. In the Scheduling Order, the trial court also recognized that Mother had previously filed a petition for protection from abuse against Father, under the Protection From Abuse (PFA) Act, 23 Pa.C.S.A. § 6101-6122. Scheduling Order, 8/9/24, at 4. The trial court observed that a final PFA "order protecting Mother was entered after a hearing and expires April 17, 2026." *Id.* The Scheduling Order further directed the parties to make available for the custody trial all adult residents of their respective households. *Id.* Finally, the Scheduling Order awarded Mother sole legal custody of Child "until the custody trial, at which the issue shall be re-evaluated." *Id.* at 11.

[8] The trial court's order (Contempt Proceeding Order) directed Father to, *inter alia*, reimburse Mother for her "out-of-pocket expenses that she documented during the contempt proceeding[.]" Contempt Proceeding Order, 8/9/24, at 1. The Contempt Proceeding Order further directed that, in light of Father's withholding physical custody from Mother and refusal to disclose Child's
*(Footnote Continued Next Page)*

- 4 -

2024[; the appeal was docketed at 1197 MDA 2024]. That matter was quashed by the Superior Court on October 21, 2024.[9]

Trial occurred over parts of three days [(Custody Trial)] …, consisting of a full day on [October 18, 2024,] and two half days[, on October 30, 2024, and November 1, 2024.]

Trial Court Opinion, 12/30/24, at 3-4 (footnotes added; capitalization and punctuation modified); *see also id.* at 2 ("This a case where there is a considerable degree of conflict[,] which has not abated noticeably since the outset of the case.").

At the Custody Trial, Sandra Thompson, Esquire (Attorney Thompson or Mother's attorney), represented Mother, and Father proceeded *pro se*. Preliminarily, the trial court conducted an *in camera* interview of Child, who was 13 years old at the time. *See* N.T., 10/18/24, at 10-39. Regarding Mother, Child testified, "I feel safe with her, but she does [] extraordinary things." *Id.* at 34. Child elaborated that Mother had previously "grabbed me by my neck and [] just pressed for no reason." *Id.* at 35; *see also id.* at 34

---

whereabouts, "Child is to be turned over to [Mother] or a representative of [Mother] within 24 hours[,] and Father will be taken into custody and … he will be released only upon confirmation that the Child has been turned over to [Mother]." *Id.* at 3 (capitalization modified).

[9] This Court quashed Father's appeal, *sua sponte*, based on our determination that neither the Contempt Proceeding Order, nor the Scheduling Order, was final or otherwise appealable. *See generally* Order (1197 MDA 2024), 10/21/24 (citing, *inter alia*, *G.B. v. M.M.B.*, 670 A.2d 714, 720 (Pa. Super. 1996) (holding a custody order is final and appealable after the trial court has concluded its hearings on the matter and the resultant order resolves the pending custody claims between the parties)).

- 5 -

(Child describing another occasion wherein "[Mother] was like basically throwing me around … my room."). Child informed Father about these incidents. *Id.* at 35.

Child testified that his preferred outcome would be "to flip" the schedule of physical custody in the Original Custody Order, *i.e.*, wherein Mother had primary physical custody and Father had partial custody (mainly during the summer). *Id.* at 39; *see also id.* at 23 (Child stating, "I want to spend more time with [Father]."). Child confirmed that he "want[ed] to spend, basically most of the time with [Father and] go to school down" in South Carolina, and "just go for the summer" with Mother. *Id.* at 39; *see also id.* at 25 (Child explaining that he preferred custody time with Father versus Mother, as Child can "do better stuff with [Father].").

Mother testified at the Custody Trial, and also presented testimony from several other witnesses.[10] Mother testified she and Child reside in a single-

_____

[10] Mother's witnesses included extended family members, friends, neighbors, and Child's therapist. Mother also presented testimony from a Sheriff's Deputy from South Carolina, Daylon Starnes (Deputy Starnes). Deputy Starnes, an employee of the Chesterfield County Sheriff's Office, testified that on August 9, 2024, he traveled to Father's address of record (located in Jefferson, South Carolina), in response to a "welfare check" call from Mother. N.T., 10/18/24, at 55. When Deputy Starnes arrived at Father's purported residence, an elderly man was at the property, who stated that he "and his wife stay at that address." *Id.* at 56. Deputy Starnes testified this man maintained no child resided at that address. *Id.*; *see also id.* at 57 (Deputy Starnes stating the man "let me walk through the house. I didn't see any signs of a juvenile living there or being there.").

family residence located in York, Pennsylvania. N.T., 10/30/24, at 23. Mother stated she is employed as a licensed contractor and real property investor. *Id.* Mother denied ever physically striking Child. *Id.* at 30, 162-63.

Mother testified that Father had physically abused her on multiple occasions, both pre- and post-separation. *Id.* at 74-75. In 2022, after the parties' separation, Father "jumped through [Mother's car] window, [] pulled [Mother] out [of] the car, and slammed [Mother's] face … onto the ground[.]" *Id.* at 74 (punctuation modified). Mother testified this incident caused her serious injury, and that she incurred "over $5,000" in costs related to dental work to "get my teeth repaired[.]" *Id.* Mother stated that in an effort to conceal her injuries from Child, she "wore a mask in [her] house[. Child] thought [Mother] had COVID -- so that he wouldn't know what had happened." *Id.* Mother further testified to a prior instance of physical abuse, wherein Father

> slammed [Mother's] head against the [wall] in the bathroom and [Mother's] earring went through the back of [her] head …, and [she] fell down the steps … [and] lost consciousness.

*Id.* at 74-75.

Mother testified that Father was very manipulative and "more … concerned with his own well-being [] than he is [of C]hild's well-being[.]" *Id.* at 76-77; *see also id.* at 77 (Mother stating that she had seen Father previously use the same manipulation tactics "over and over again with [Child's siblings], as well. [Child] doesn't understand that or know that.").

Mother testified Father "encouraged [Child] to lie to [Mother], and also [was] having secret meetings" with Child. *Id.* at 69. Mother introduced into evidence numerous text messages, including many messages sent between Child and Father that Mother obtained from Child's cell phone. *Id.* at 79; *see also generally* Mother's Exhibits. According to Mother, many of the text messages between Child and Father "basically [involve Father] … encouraging [Child] to be dishonest with [Mother] and things like that." *Id.* at 81; *see also id.* at 80 (Mother asserting the parties are "not co-parenting.").[11]

Father testified at the Custody Trial, and also presented testimony from Child's siblings and Child's former assistant school principal. Father testified that he resides in South Carolina, along with Father's mother, S.B. (Paternal Grandmother).[12] *Id.* at 222. Father stated that "[Child] has told me [on] multiple occasions that he … has been physically hurt by [Mother] hitting, slapping [Child] in the back of the head[.]" *Id.* at 197; *see also id.* at 202 (Father asserting "I'm not making [the abuse allegations] up. Nobody is

_____

[11] Mother thoroughly detailed the content of the text messages during the Custody Trial. N.T., 10/30/24, at 80-97, 101-24.

[12] In violation of the Scheduling Order, Father failed to make Paternal Grandmother, an adult resident of Father's household, available for trial. *See* Scheduling Order, 8/9/24, at 4; *see also id.* at 9 (providing that "[e]xcept for the parties, children, and counsel, all witnesses … are preapproved to testify by Zoom" videoconferencing). As we explain *infra*, the trial court found there was no "clear, credible testimony that Father[, in actuality,] resided in South Carolina with [] Paternal Grandmother." Trial Court Opinion, 11/12/24, at 6 (capitalization modified).

telling [Child] to make this up. I wouldn't tell a kid to make something up."). Father further testified Child informed Father that Mother was "pressuring [Child] to do stuff he don't wanna [*sic*] do and go places he don't wanna [*sic*] go." ***Id.*** at 198.

According to Father, he in no way influenced Child's preference to reside primarily with Father in South Carolina. ***Id.*** at 201 ("I never tried to convince [Child] to do anything."). Father testified that he "provide[s Child] everything that he needed in a household. I give him the … mental support, the emotional support, the motivation." ***Id.*** at 216. Father further claimed that he never disparaged Mother to Child. ***Id.*** at 202 (Father asserting "I don't have no [*sic*] problem with [Mother,]" and that Father will "even encourage [Child] to … make sure [Child says] happy birthday to [Mother.]"); ***see also id.*** at 221 (Father stating, "I'm not here to bash [Mother].")." On cross-examination, Father denied manipulating Child or instructing Child to deceive or defy Mother. ***Id.*** at 223-24.

By order entered November 15, 2024 (Custody Order), the trial court awarded Mother sole legal custody and primary physical custody of Child, subject to Father's periods of partial, professionally-supervised custody.[13]

---

[13] The Custody Order provided that Father's periods of partial physical custody "shall occur only in York County, Pennsylvania. Father's professionally supervised visits shall occur on the second Saturday of each month from 9:00 a.m. until 1:00 p.m., or at other such times as the parties may find mutually agreeable." Custody Order, 11/15/24, at 3; ***see also*** 23 Pa.C.S.A. § 5322 (defining "supervised physical custody").

*See* Custody Order, 11/15/24, at 1-4. Contemporaneously with its Custody Order, the trial court issued a thorough opinion that, *inter alia*, addressed the child custody factors contained in the Child Custody Act (the Act), 23 Pa.C.S.A. §§ 5301, *et seq.*, which a trial court must consider in making any custody ruling. ***See generally*** Trial Court Opinion, 11/15/24 (analyzing the statutory custody factors of 23 Pa.C.S.A. § 5328(a) (discussed *infra*)). The court concluded that "[b]ased on the evidence presented at [the Custody T]rial, the court finds it is in the [C]hild's best interest for Mother to have sole legal custody and primary physical custody. Father shall have limited, professionally[-]supervised visits only, in addition to other safeguards." Trial Court Opinion, 11/15/24, at 21.

Relevant to the instant appeal, the Custody Order included the following provision regarding Father's communications with Child (communication restriction):

> Due to the extensive evidence of alienation in this case, Father is prohibited from having any communications with Child that are not supervised. The [trial c]ourt will not mandate professional supervision for calls, but Child may not call, videoconference with, text or message, or otherwise communicate with Father by any means outside of the presence of Mother or a supervisor which [Mother], in her sole discretion, may identify.

Custody Order, 11/15/24, at 5-6.

The Custody Order also disposed of Mother's outstanding petitions for contempt, via the following provision (contempt provision):

> As noted in the accompanying Opinion, the [trial] court does find Father in contempt for withholding custody and for inducing

- 10 -

Mother to make considerable expenditures in counsel fees and travel [costs] related to [Father's] contempt. No makeup time will be provided for, given the schedule of custody. Mother is awarded expenses and counsel fees as described in the court's prior statement at the conclusion of the [August 9, 2024, Pretrial H]earing addressing contempt, which the court ratifies and readopts. Any contempt claim by Mother not addressed [previously] or herein is denied.

*Id.* at 13.

Father timely filed a *pro se* notice of appeal from the Custody Order,[14] contemporaneously with a *pro se* concise statement of errors complained of on appeal (Concise Statement). **See** Pa.R.A.P. 1925(a)(2)(i) (mandating that in children's fast track appeals, the "concise statement of errors complained of on appeal shall be filed and served with the notice of appeal."). Father's

_____

[14] We pause to address the appealability of the Custody Order. On January 3, 2025, this Court issued a Rule upon Father to show cause why the Custody Order was final and appealable, because it was unclear whether the order, to the extent it contained the contempt provision, was final or otherwise appealable. Order, 1/3/25, at 1 (citing, *inter alia*, **Foulk v. Foulk**, 789 A.2d 254, 257 (Pa. Super. 2001) (*en banc*) (holding that a contempt order will be considered final and appealable where sanctions are imposed without the need for any further trial court action)); **see also** Pa.R.A.P. 341(a) (providing that generally, an appeal may be taken only from a final order, *i.e.*, an order that disposes of all claims and all parties). Father timely filed a *pro se* response three days later, maintaining the Custody Order, including the contempt provision, was final and appealable, since "no further [trial] court action [was] necessary to enforce these sanctions[.]" Response, 1/6/24, at 2 (unpaginated). On January 8, 2025, this Court discharged the Rule and referred the matter to the merits panel. Order, 1/8/25. We conclude the Custody Order is final and appealable, based on Father's response and the language of the contempt provision stating that "[a]ny contempt claim by Mother not addressed [previously] or herein is denied." Custody Order, 11/15/24, at 13. On appeal, Father does not challenge the contempt provision.

Concise Statement spanned 12 pages and alleged **26 separate claims** of trial court error.[15]  ***See generally*** Concise Statement, 12/3/24.  The trial court issued a thorough Pa.R.A.P. 1925(a) opinion on December 30, 2024, wherein it addressed, and rejected, each of Father's 26 claims raised in the Concise Statement.

On appeal, Father presents **13 issues**[16] for our review:

_____

[15] We caution Father, "this Court has held that when appellants raise an 'outrageous' number of issues in their 1925(b) statement, the appellants have 'deliberately circumvented the meaning and purpose of Rule 1925(b) and ha[ve] thereby effectively precluded appellate review of the issues [they] [] seek to raise.'" ***Tucker v. R.M. Tours***, 939 A.2d 343, 346 (Pa. Super. 2007) (quoting ***Kanter v. Epstein***, 866 A.2d 394, 401 (Pa. Super. 2004)); ***see also Lineberger v. Wyeth***, 894 A.2d 141, 148 (Pa. Super. 2006) ("When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues." (citation omitted)); Pa.R.A.P. 1925(b)(4)(iv) (clarifying that the sheer number of issues raised in a concise statement is not sufficient grounds to find waiver if the issues are "non-redundant, non-frivolous[, and] set forth **in an appropriately concise manner**." (emphasis added)).

[16] We emphasize our disapproval of Father's appellate strategy of raising myriad issues.

> As the Honorable Ruggero J. Aldisert of the United States Court of Appeals for the Third Circuit has stated, "it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors.  I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to *any* of them … [and] it is [this] presumption … that reduces the effectiveness of appellate advocacy."

***Commonwealth v. Montalvo***, 205 A.3d 274, 301-02 (Pa. 2019) (quoting Aldisert, "*The Appellate Bar: Professional Competence and Professional*
*(Footnote Continued Next Page)*

1. Did the trial court err by failing to properly apply the statutory custody factors under 23 Pa.C.S.A. § 5328(a)?

2. Did the trial court err by disregarding the [C]hild's stated preference to reside with [Father]?

3. Were the restrictions on [Father's] communication with the [C]hild unsupported by evidence, violating [Father's] due process rights?

4. Did the trial court improperly rely on unsubstantiated allegations of abuse to impose supervised visitation?

5. Did judicial bias and abuse of discretion deprive [Father] of a fair trial?

6. Did the trial court err in admitting illegally obtained text messages?

7. Did the trial court improperly deny [Father's] text[-]message evidence[,] while admitting similar evidence from [Mother]?

8. Did the trial court violate [Father's] procedural due process rights by conducting a hearing without [giving Father] notice?

9. Did the trial court err in detaining [Father] without properly considering allegations of abuse raised against [Mother]?

10. Did the trial court err by admitting unverified receipts submitted by [Mother], violating the Pennsylvania Rules of Evidence?

11. Did the trial court err in accepting [Mother's] false claims regarding summer school without verification?

_____

*Responsibility—A View From the Jaundiced Eye of the Appellate Judge*," 11 Cap. U.L. Rev. 445, 458 (1982) (emphasis in original)); ***see also Jones v. Barnes***, 463 U.S. 745, 751-52 (1983) ("Experienced advocates since time beyond memory emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").

12. Did the trial court improperly admit inconsistent and unverified evidence?

13. Did the trial court violate [Father's] constitutional rights by removing medical decision-making rights without justification?

Father's Brief at 4-5 (unpaginated) (issues reordered).

Preliminarily, we address whether Father preserved his issues. ***See In re F.C. III***, 2 A.3d 1201, 1211 (Pa. 2010) ("Issue preservation is foundational to proper appellate review."). The issues Father raises in his statement of questions presented are phrased differently than the multitudinous issues he included in his prolix Concise Statement. ***Compare*** Father's Brief at 4-5 (unpaginated), ***with*** Concise Statement, 12/3/24.

Under our appellate rules, an appellant may not raise issues on appeal that they did not raise before the trial court. ***See*** Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Moreover, "it is well-settled that issues not included in an appellant's … concise statement of errors complained of on appeal are waived." ***In re M.Z.T.M.W.***, 163 A.3d 462, 466 (Pa. Super. 2017) (citation omitted); ***see also*** Pa.R.A.P. 1925(b)(4)(vii) (providing that "[i]ssues not included in the Statement … are waived."); ***In the Interest of: G.D. v. D.D.***, 61 A.3d 1031, 1036 n.3 (Pa. Super. 2013) (stating where a *pro se* appellant raises an issue in an appellate brief that is not raised in their Pa.R.A.P. 1925(a)(2)(i) statement, this Court may find waiver).

Instantly, Father's issues numbered 1-10 are either substantially similar to — or fairly suggested by — issues identified in his Concise Statement, and the trial court addressed these issues in its Rule 1925(a) opinion. Accordingly, we decline to find waiver of these issues, notwithstanding the variances between Father's statement of questions involved and Concise Statement. *See Durning v. Balent/Kurdilla*, 19 A.3d 1125, 1127 n.2 (Pa. Super. 2011) (addressing merits of appellant's issues, which "were raised, or fairly suggested by, issues raised in [appellant's] concise statement[.]").

With respect to Father's issues numbered 11-13, Father did not raise these issues in his Concise Statement, nor are they fairly suggested thereby.[17] Accordingly, these issues are waived.[18] *In re M.Z.T.M.W.*, 163 A.3d at 466

---

[17] The trial court did not address these three issues in its Rule 1925(a) opinion. *See Commonwealth v. Smith*, 304 A.3d 35, 39 (Pa. Super. 2023) (observing that Rule 1925 is "intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal." (citation omitted)).

[18] Although we recognize that Father is proceeding *pro se* in this matter, his status as a *pro se* litigant does not relieve him of his responsibility to preserve his issues. It is well established that

> [w]hile this [C]ourt is willing to liberally construe materials filed by a *pro se* litigant, … [such litigant] is not entitled to any particular advantage because he lacks legal training. Further, any layperson choosing to represent himself in a legal proceeding must, to some reasonable extent, assume the risk that his lack of expertise and legal training will prove his undoing.

*Rich v. Acrivos*, 815 A.2d 1106, 1108 (Pa. Super. 2003) (internal citations, brackets and quotation marks omitted).

("With respect to issues not included in a concise statement, our Supreme Court has instructed that this Court has no discretion in choosing whether to find waiver. **Waiver is mandatory**[.]" (citing *City of Philadelphia v. Lerner*, 151 A.3d 1020, 1024 (Pa. 2016) (emphasis added)); *see also* Pa.R.A.P. 1925(b)(4)(vii); *B.G. Balmer & Co. v. Frank Crystal & Co.*, 148 A.3d 454, 467 (Pa. Super. 2016) (stating appellate courts "will not countenance anything less than strict application of waiver pursuant to Rule 1925(b).").

To begin, we recognize that "[o]ur standard of review over a custody order is for a gross abuse of discretion." *Rogowski v. Kirven*, 291 A.3d 50, 60 (Pa. Super. 2023) (citation omitted); *see also King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005) ("It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, based on the evidence presented, giv[ing] due deference to the trial court's weight and credibility determinations, the trial court erred or abused its discretion[.]" (citation and some quotation marks omitted)). "A trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will." *In the Int. of J.R.*, _____ A.3d _____, 2025 PA Super 58, slip. op. at 9-10 (Pa. Super. Mar. 13, 2025) (citation and brackets omitted). Further,

> the discretion that a trial court employs in custody matters should
> be accorded the utmost respect, given the special nature of the

proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*B.S.G. v. D.M.C.*, 255 A.3d 528, 533 (Pa. Super. 2021) (citations and brackets omitted).

"This Court's scope of review in custody cases consistently has been defined by our Supreme Court as very broad." *King*, 889 A.2d at 632 (citations omitted). "[W]hile we have a broad scope of review, we cannot nullify the fact-finding function of the judge presiding over the custody hearing or their ability to make credibility determinations." *Velasquez v. Miranda*, 321 A.3d 876, 891 (Pa. 2024) (citation omitted); *McGee v. McDowell*, _____ A.3d _____, 2025 PA Super 52, slip. op. at 1 (Pa. Super. Mar. 4, 2025) ("We defer to the trial judge regarding credibility and the weight of the evidence."). Further, it is well-settled that "[t]he parties cannot dictate the amount of weight the trial court places on evidence." *R.M.G. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (citation omitted); *see also id.* (stating that in reviewing a child custody ruling, "[a]ppellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion." (citation omitted)).

Instantly, we address Father's first and second issues together, as they are closely related. Father claims the trial court erred in its application of the custody factors, and improperly issued a Custody Order that is contrary to

Child's best interests and stated preference. *See* Father's Brief at 6-8 (unpaginated). According to Father, "the trial court disregarded critical testimony and evidence regarding sibling relationships, parental fitness, and the Child's stated preference, leading to a Custody Order that was not supported by the record." *Id.* at 7 (unpaginated) (emphasis omitted; capitalization modified). Father contends the trial court "failed to adequately consider the [C]hild's testimony regarding [Child's] strong bond with [Child's] siblings and his clear preference to reside with Father." *Id.* at 7 (unpaginated) (emphasis omitted); *see also id.* at 8 (unpaginated) ("[T]he trial court gave undue weight to Mother's testimony, discounting the [C]hild's own voice and lived experiences." (emphasis omitted)). Regarding Child's relationships with Child's siblings, Father cites this Court's decision in *Johns v. Cioci*, 865 A.2d 931 (Pa. Super. 2004), wherein we recognized

> the policy in Pennsylvania [] to permit siblings to be raised together, whenever possible (the doctrine of "family unity" or "whole family doctrine"). Absent compelling reasons to separate siblings, they should be reared in the same household to permit the continuity and stability necessary for a young child's development.

*Id.* at 942 (internal citations and some quotation marks omitted); Father's Brief at 8 (unpaginated).

Mother counters the trial court correctly weighed the custody factors, including the factors pertaining to Child's preferred outcome and sibling relationships, and properly entered a Custody Order that promoted Child's best interests. *See* Mother's Brief at 1-12. Although Mother concedes that

- 18 -

"Child's preference was strongly weighted towards Father[,]" she emphasizes that the preference of a child is but one factor in the custody factors analysis, and that the weight to be given to a child's preference "can best be determined by the judge before whom" the child appears. *Id.* at 7, 12 (capitalization modified) (quoting *Lombardo v. Lombardo*, 527 A.2d 525, 529 (Pa. 1987) (citation omitted)). Mother further maintains the trial court appropriately found that Child's siblings are adults, who "do not live with either [Mother or Father], so preserving a sibling bond is not the same in this case as it would be with two minor siblings facing parental separation." *Id.* at 7 (citing Trial Court Opinion, 11/12/24, at 12).

In reviewing Father's claims, we are mindful that "[t]he paramount concern in custody cases is the child's best interest." *Velasquez*, 321 A.3d at 904 (citing *C.G. v. J.H.*, 193 A.3d 891, 909 (Pa. 2018)).

> The issue is decided on a case-by-case basis considering all relevant factors, and giving weighted consideration to those that affect the child's safety. *See* 23 Pa.C.S.A. § 5328(a) (when "ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors … which affect the safety of the child").

*Velasquez*, 321 A.3d at 904-05 (citation modified).

Section 5338 of the Act provides that "[u]pon petition, a court may modify a custody order to serve the best interest of the child." 23 Pa.C.S.A. § 5338(a); *see also K.D. v. E.D.*, 267 A.3d 1215, 1224 (Pa. Super. 2021) ("[C]ustody matters are a special creature. Unlike other actions which have

- 19 -

a clear beginning, middle, and end, custody orders may be repeatedly modified." (citation and ellipses omitted)). A party requesting modification of custody has the burden to show that modification is in the child's best interest. *J.M.R. v. J.M.*, 1 A.3d 902, 911 (Pa. Super. 2010).

Section 5328(a) of the Act enumerates a non-exclusive list of factors (custody factors)[19] that a trial court must consider before making any custody determination:

> **(a)** *Factors*. In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:

---

[19] Effective August 13, 2024, the General Assembly enacted significant amendments to the custody factors "pursuant to Act of April 15, 2024, P.L. 24, No. 8 (known as 'Kayden's Law')." *Velasquez*, 321 A.3d at 886 n.6.

> Kayden's Law expand[ed] the factors to be considered in the court's best interest analysis and **now requires the court to give substantial weighted consideration to"** *inter alia*, **the "safety of the child,"** which is defined in Kayden's Law as including "the physical, emotional and psychological well-being of the child," and any **"[v]iolent or assaultive behavior committed by a party."** Act of April 15, 2024, P.L. 24, No. 8, §§ 2-3 (as amended 23 Pa.C.S. §§ 5322(a), 5328(a)).

*Velasquez*, 321 A.3d at 886 n.6 (emphasis added).

Instantly, as the trial court correctly observed, "[t]he litigation in this case concerns a [Custody T]rial date that occurred following the effective date of 'Kayden's Law.'" Trial Court Opinion, 12/30/24, at 5; *see also id.* at 15 ("When this case last went to trial" in September 2022, *i.e.*, prior to the issuance of the Original Custody Order, "Kayden's Law had not gone into effect. **The impact of that statutory change mattered in this case.**" (emphasis added)).

**(1)** Which party[20] is more likely to ensure the safety of the child.

**(2)** The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

**(2.1)** The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

**(2.2)** Violent or assaultive behavior committed by a party.

**(2.3)** Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

**(3)** The parental duties performed by each party on behalf of the child.

**(4)** The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

**(5)** The availability of extended family.

**(6)** The child's sibling relationships.

**(7)** The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.[21]

---

[20] We are mindful that in any child custody action between parents, the Act mandates that "there shall be no presumption that custody should be awarded to a particular parent."  23 Pa.C.S.A. § 5327(a); **see also id.** § 5328(b) (in making any custody determination, there shall be no preference based upon gender).

[21] With respect to a child's stated preference,

*(Footnote Continued Next Page)*

**(8)** The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

**(9)** Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

**(10)** Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

**(11)** The proximity of the residences of the parties.

**(12)** Each party's availability to care for the child or ability to make appropriate child-care arrangements.

**(13)** The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

---

[t]he significance placed on the preference of the child who is at the center of the custody dispute is [] within the discretion of the trial judge. We have held that … [a]lthough the express wishes of a child are not controlling in custody decisions, such wishes do constitute an important factor that must be carefully considered in determining the child's best interest. The weight to be attributed to a child's testimony can best be determined by the judge before whom the child appears. The child's preference must be based upon good reasons and his or her maturity and intelligence must also be considered.

*R.M.G.*, 986 A.2d at 1239 (citations omitted; formatting modified).

**(14)** The history of drug or alcohol abuse of a party or member of a party's household.

**(15)** The mental and physical condition of a party or member of a party's household.

**(16)** Any other relevant factor.

23 Pa.C.S.A. § 5328(a) (footnotes added).

This Court has stated that "all of the [custody] factors listed in [Section] 5328(a) are required to be considered by the trial court when entering a custody order." **K.D.**, 267 A.3d at 1231 (citation, emphasis, and brackets omitted); **A.V. v. S.T.**, 87 A.3d 818, 822-23 (Pa. Super. 2014) ("The record must be clear on appeal that the trial court considered all [of the custody] factors."); **see also** 23 Pa.C.S.A. § 5323(d) (requiring a trial court to "delineate the reasons for its decision[.]"). "**It is within the trial court's purview as the finder of fact to determine which** [**custody**] **factors are most salient and critical in each particular case.**" **E.B. v. D.B.**, 209 A.3d 451, 468 (Pa. Super. 2019) (citation omitted; emphasis added).

Instantly, we will address, *seriatim*, the trial court's consideration of each of the custody factors in its thorough opinion accompanying the Custody Order.

**CUSTODY FACTORS**

(1) Which party is more likely to ensure the safety of the Child.

The trial court found this factor was neutral and stated the court "gives it minimal weight." Trial Court Opinion, 11/12/24, at 6. The court reasoned that

> [t]he testimony the court [considered at the Custody Trial] regarding this matter was that Father stated concern over Mother's parenting of Child being too physical. [**See**, **e.g.**, N.T., 10/30/24, at 197, 202.] [Father's] testimony was not credible … and was not backed up by evidence to place [Mother's] alleged conduct so far as to be abusive. Mother admitted to conduct that certainly would qualify as corporal punishment[ (**see id.** at 30, 162)], but the [trial] court found [Mother's] testimony credible that it was not excessive punishment, and [the court] found less credible testimony from other witnesses that [Mother's punishment of Child] exceeded the legally permissible threshold.[22] As a result, the court did not conclude that there was abusive conduct by Mother beyond the corporal punishment permitted under Pennsylvania law.
>
> The court notes, as to the safety factor, that not all adult household residents of Father were made available for questioning at trial as required, so it was impossible to ascertain even basic facts about Child's status at his alleged home [with Father] in South Carolina. Credible testimony from … Deputy [Starnes] … suggested that the person who answered the door at Father's alleged South Carolina address did not know that a child stayed there, suggesting to the [trial] court that the address Father gave to Mother and the court was not the actual location where Child stays with Father. The court found Father's testimony less credible than that of … Deputy [Starnes,] who had no stake in the case and no reason to provide misleading testimony. The Child

---

[22] "Parents or guardians may use corporal punishment to discipline their children so long as the force used is not designed or known to create a substantial risk of death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation." **P.R. v. Dep't of Pub. Welfare**, 801 A.2d 478, 485 (Pa. 2002) (some citations omitted) (citing, inter alia, 18 Pa.C.S.A. § 509(1) (detailing the circumstances where a parent or guardian may be justified in using force upon a child)).

himself did not provide clear, credible testimony that Father resided in South Carolina with [] Paternal Grandmother, either.

The court heard virtually nothing about the circumstances or condition of the residence where Child allegedly stays with Father, and could not make a meaningful analysis of whether Father can provide a safe home for Child.

Trial Court Opinion, 11/12/24, at 5-6 (footnote and citations added; punctuation and capitalization modified).

(2) The present and past abuse committed by a party or member of the party's household.

The trial court found that "[t]his factor **favors Mother overwhelmingly** and the court gives it heavy weight." Trial Court Opinion, 11/12/24, at 7 (emphasis added). The court reasoned as follows:

Mother testified credibly that [in 2022,] Father [physically] attacked Mother and caused her damages that resulted in $5,000.00 worth of dental work. [*See* N.T., 10/30/24, at 74.] The [trial] court did not give any weight to the fact that Father has pending criminal charges [regarding Father's attack] involving Mother …, as [those charges have] not been reduced to a final determination through a plea or a trial verdict.[23]

**The court concludes that Mother's accusation of abuse at the hands of Father is credible. In addition to that, the court was concerned about the behaviors of Father in this case**, as he withheld custody; he encouraged Child to resist Mother's discipline; he arranged to meet with Child in a clandestine manner; he routinely concealed Child's location from Mother; and [Father] otherwise undermined the relationship between Mother and Child. Father's controlling, manipulative behaviors are wholly consistent with perpetrators of domestic

---

[23] Although Father alleges on appeal that the criminal charges against him were "tried and resulted in a hung jury[,]" Father's Brief at 11 (unpaginated), the record does not disclose the ultimate disposition of the criminal charges.

violence, and the [trial c]ourt is gravely concerned that Father will continue to use Child as a means of manipulating Mother.

Trial Court Opinion, 11/12/24, at 7 (footnote, citations, and emphasis added; punctuation modified).

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

The trial court found that this factor "favors neither party," and stated it gave "no significant weight" to this factor. *Id.* at 8. The court elaborated that it "did not hear any credible testimony of actions that would rise to the level of abuse by either of the parties against Child." *Id.*

(2.2) Violent or assaultive behavior committed by a party.

The trial court found that this factor "favors Mother significantly and the court gives it significant weight." *Id.* The court reasoned that

Father had assaulted Mother and caused her serious harm. The [2022] incident [involving Father's damaging Mother's teeth] was clearly the kind of conduct contemplated when this factor was enumerated by the Legislature as one to be considered by trial courts. It was difficult to hear and see Mother as she testified about the violence perpetrated by Father on her. It is not apparent from the [Custody Trial] transcript, but Mother could not even face Father during her emotional testimony, and the court, which hears hundreds of cases each year involving domestic violence, did not perceive Mother's response as anything than wholly genuine and uncontrived.

*Id.*

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the Child and another party if contact is consistent with the safety needs of the Child.

The trial court found this "factor favors Mother and the court gives it moderate weight." Trial Court Opinion, 11/12/24, at 9. The court elaborated that it

> heard testimony from both parties on this matter. Father says that Mother is taking Child's phone away as a means of cutting off access to Father. [**See** N.T., 10/30/24, at 203, 212-13.] Mother affirmed that she had taken Child's cell phone away, but that she had replaced it with a flip phone. [**Id.** at 119-20, 191-92.] [Mother's] reason for doing this was to mitigate the alienation of Child that Father would engage in surreptitiously through Child's smartphone. [**Id.** at 64-65, 191-92.] Mother did also testify that she does allow Child to have his computer[,] which is a way in which [Child] does communicate with Father. [**Id.** at 192.] On the other hand, Father would take Child for periods of custody and fail to advise Mother as to even such basic facts as Child's whereabouts. [**Id.** at 36-37, 40.]

Trial Court Opinion, 11/12/24, at 9 (citations added).

(3) The parental duties performed by each party on behalf of the Child.

The trial court found this "factor favors Mother significantly and the court gives it significant weight." **Id.** The court explained that

> [t]he testimony the court heard on this factor is that [**the parental**] **duties are almost exclusively performed by Mother.** Testimony the court heard was that Mother provides for Child's personal, housing, educational, and medical needs. [**See** N.T., 10/30/24, at 23-24, 31-33, 68-70.] Father[, in] contrast[,] has not provided even financial support for Child recently. [**Id.** at 72-73.] After a number of partial days of trial, **it is unclear to the court whether Father has a present legal, sustainable income.** Father did not make clear to the court the ways in which he does care for Child[,] let alone what [Father] would do if he had greater custody of Child.

Trial Court Opinion, 11/12/24, at 9 (emphasis and citations added).

(4) The need for stability and continuity in the Child's education, family life and community life.

The trial court found this "factor favors Mother significantly and the court gives it significant weight." *Id.* at 10. According to the trial court,

[t]he testimony that was given to the court on this factor focused on Father's actions. It was testified to, with evidence, that Father has been undercutting Mother on school matters. [*See* N.T., 10/30/24, at 96-98, 102-05.] Father has been telling Child to fake symptoms to get out of school and to put his head down all day when he is there. [*See id.*] Father withheld custody of Child unilaterally for significant periods of time. Father's alienation of Child and interruption of Child's participation in family events with Mother has disrupted Mother's reasonable efforts to engage Child with extended family in pro-social contexts.

Trial Court Opinion, 11/12/24, at 10 (citations added).

(5) The availability of extended family.

The trial court found this "factor favors Mother significantly and the court gives it significant weight." *Id.* at 11. The court reasoned as follows:

Mother brought in several of her extended family members [as witnesses at the Custody Trial,] and testified to more [extended family members being involved in Child's life. *See*, *e.g.*, N.T., 10/18/24, at 60-68, 98-104, 107-22, 125-47; N.T., 10/30/24, at 7-22.] Generally, it appears that Mother is very in tune with her extended family, many of whom are very positive and respected local resources. Father, conversely, only made claims that "I have [50 … great people that could come testify on my behalf,]" [N.T., 10/30/24, at 207,] but [Father] produced no specifics, either in his testimony or the testimony of [Father's] extended family [members]. [Father] did not even produce as a witness Child's Paternal Grandmother, who is allegedly [also a resident of Father's] household … and [was] required to be available at [the] Custody Trial.

Trial Court Opinion, 11/12/24, at 10-11 (citations added; punctuation and capitalization modified).

(6) The Child's sibling relationships.

The trial court found that this factor was **neutral and assigned it**

**"minimal weight."** *Id.* at 12 (emphasis added).  The court explained that

[t]he only sibling relationships Child has are [with] the two older, **adult** children of the parties.  Mother's testimony is that [Child's siblings] have essentially sided with Father and are doing a great deal to assist with his alienation of Child from Mother.  [*See*, *e.g.*, N.T., 10/30/24, at 48-50, 57-64, 68, 77.]  Mother also relayed concerns that the paramour of Child's sister[, P.O.,] is an active drug dealer, recently released from incarceration, who is currently unsafe for Child to be around.  [*Id.* at 49.]  The court found [Mother's] evidence and testimony credible and convincing.

\* \* \*

[P.O.] clearly had grievances with Mother …, and was alienated from her Mother as a result.  [*See* N.T., 10/18/24, at 148-68 (P.O.'s direct testimony); N.T., 10/30/24, at 48-51 (Mother's testimony regarding P.O).] ….

The Child's elder brother[, T.O., Jr.,] was involved in a scuffle with Mother in which, [Mother] credibly testified, [] [T.O., Jr.] grabbed … her and caused her head to strike an object in her home.  [*See* N.T., 10/30/24, at 58-59.]  [T.O., Jr.] is also alienated from Mother and lives near Father, out[-]of[-]state in either Georgia or South Carolina, according to conflicting and unclear testimony.  [*See* N.T., 10/18/24, at 196-220 (T.O., Jr.'s direct testimony); N.T., 10/30/24, at 52-56 (Mother's testimony regarding T.O., Jr.).]

While the court seeks to preserve bonds between children and their siblings, **the court is also concerned with how healthy those bonds are.**  The [] testimony [of Child's siblings at the Custody Trial] did nothing to dispel the notion that Mother had painted of their behaviors being negative for Child.  Also, **these adult siblings do not live with either parent or Child, so preserving a sibling bond is not the same in this case as it would be with two <u>minor</u> siblings facing parental separation.**

- 29 -

Trial Court Opinion, 11/12/24, at 11-12 (emphasis and citations added; punctuation modified); ***see also*** Trial Court Opinion, 12/30/24, at 37 ("The court concluded that [the] testimony [of Child's siblings] was of limited utility due to their lack of objectivity[.]").

(7) The well-reasoned preference of the Child, based on the Child's developmental stage, maturity and judgment.

The trial court found that **this factor "favors Father slightly …, and the court gives it moderate weight."** Trial Court Opinion, 11/12/24, at 13 (emphasis added). The court stated that it

> heard testimony from Child [at the Custody Trial]. Child's preference was strongly weighed towards Father. Child expressed a desire to flip the schedule of [physical] custody from [the arrangement provided in the Original Custody Order,] to favor time with Father over Mother. [***See*** N.T., 10/18/24, at 39.] Testimony from Child was that Mother has hit him previously, but the degree to which this was done was not made clear from the testimony. [***Id.*** at 34, 35.] The [trial] court is not certain that this rises to the level of abuse, and [no child welfare agency] has [] been involved with these parties, despite the matter apparently being reported by Child's school. The extreme alienation that has been occurring does make it difficult to parse what is expressed by Child and what [representations by Child are the result of parental] coaching.

Trial Court Opinion, 11/12/24, at 12-13 (citations added; punctuation modified); ***see also id.*** at 13 (trial court stating it had "concerns that Child has been excessively alienated by Father").

The trial court further stated, in its Rule 1925(a) opinion, that, contrary to Father's claim on appeal, the court

> **considered the Child's stated preference, [but] discounted it due to Father's pervasive efforts to alienate the Child**

- 30 -

> **from Mother**[,] **and still found that** [**this factor**] **favored Father slightly.** The court gave it moderate weight. The Child's preference was not ignored or disregarded. It was weighed carefully in a context with other evidence offered. Ultimately, it was not the decisive factor in the case.

Trial Court Opinion, 12/30/24, at 30 (emphasis added; capitalization and formatting modified).

(8) The attempts of a parent to turn the Child against the other parent, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the Child.

The trial court found this "factor **favors Mother overwhelmingly** and the court gives it heavy weight." Trial Court Opinion, 11/12/24, at 13 (emphasis added). The court reasoned as follows:

> Mother presented evidence and testimony alleging serious alienation of Child by Father. [***See***, ***e.g.***, N.T., 10/30/24, at 80-82, 96-97, 104-06, 119-21, 124]. The [trial] court believes that the evidence presented by Mother credibly paints a picture of some of the worst alienation, and only the parts of it that Mother could find evidence to support. Father appears to be taking every opportunity he can to depict Mother in a negative light. When Child talks about Mother in negative terms[,] Father rarely corrects Child. Father also treats their interactions as clandestine[,] implying that Mother would never approve of Child seeing Father. Father continuously undermines [Mother's] authority. This creates the image of Mother as someone who is to be hidden from and insulted, a person who is the only reason, aside from court personnel, that Child and Father cannot be happy together.

Trial Court Opinion, 11/12/24, at 13 (citation added).

(9) Which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the Child adequate for the Child's emotional needs.

The trial court found "[t]his factor overwhelmingly favors Mother and the court gives it heavy weight." *Id.* at 16. The court exhaustively detailed its reasoning as follows:

On the surface, Father's relationship with Child may appear to be loving and stable. When the curtain is pulled back, what appears behind it is a manipulative, cunning Father who is working assiduously to undermine and undercut Mother at every opportunity. This has significantly impaired Child's relationship with Mother, while Mother, trying to comply with conventional community standards for parenting by shielding Child from her conflicts with Father rather than engaging Child about it and advocating for herself, slowly watches her much more mature, responsible, and wholesome relationship with Child be destroyed by Father's actions.

Mother testified credibly that after Father disfigured her when he caused $5,000.00 of damage to her mouth and teeth, that she wore a mask around Child to shield him from the knowledge that his Father abused her in this manner. [*See* N.T., 10/30/24, at 74]. Mother testified credibly that, after Father had defied the [trial] court's custody orders in the case, and was detained until Child was produced from some unknown location out[-]of[-]state, that when Child returned, the first words to [Mother] out of Child's mouth were, essentially, "call your lawyer and have her let [Father] out of jail." [*Id.* at 43.] Child clearly had been informed about the court matters and had been told a self-serving story [by Father] about what had happened, and not a truthful one. The correct version, of course, is that Father flagrantly violated a court order for custody and, predictably, was suffering the consequences of his actions. Mother was in no way, shape, or form responsible for any of it. Furthermore, she did not share this information with Child, despite likely desperately wanting to defend herself to him.

Indicative of what was going on in this case is the following vignette. Mother testified credibly about an exchange she had with Child prior to his leaving for the summer to go with Father. [*Id.* at 94, 146-47.] Child was packing a memorial pawprint of a euthanized pet and all of his computer equipment, including multiple monitors. [*Id.* at 146.] Mother thought this an unusually thorough degree of packing for a trip and engaged with Child

- 32 -

about it, ultimately declining to allow him to take all of these [items]. [*Id.* at 147.] The court inferred from these things that Child believed he was moving in with [] Father permanently, and Father's subsequent withholding of custody at the end of the summer[] dovetailed with this hypothesis, which, the [trial] court believes, is reasonably inferred from the evidence. Mother, of course, was not consulted or in agreement.

Father did testify that he gives the Child chores to do at [Father's] home, such as cleaning up after himself and helping around the house. [*Id.* at 208-09.] Mother testifies that she tries to get Child involved in community service, and involved with local family members in [] community service and in family activities, [*id.* at 26-28, 126-27, 139-40,] even as Father would interfere with [these activities] by spending a considerable period of at least one family event in direct communication with Child, who hid out in the bathroom, avoiding spending time building wholesome family relationships in a pro-social context.

Father's actions in encouraging Child on topics [related to Child's] school and in other situations is overwhelmingly outweighed by the incredible harm [Father] has done to [Child] by actively and continuously trying to destroy the relationship Child has with Mother.

Trial Court Opinion, 11/12/24, at 14-16 (citations added; punctuation and capitalization modified).

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational, and special needs of the Child.

The trial court found this factor "favors Mother moderately" and stated it gave this factor "moderate weight." *Id.* at 17. The court reasoned as follows:

Father testified that he works out with Child. [*See* N.T., 10/30/24, at 216.] Mother testified that she handles food, clothing, school, and medical appointments. [*Id.* at 23-24, 31-33, 68-70.]

The court has concerns about Father's ability to financially provide for Child. There was no testimony to the court regarding Father's work or income, and Father continues to not pay his contempt fees or provide support for Child. Further, the lack of a credible physical address of Father, [Father's] withholding testimony from an alleged adult household member,[FN] and the fact that Child does not know or understand where he is traveling[,] raises grave concerns about Father's ability to provide stability.

> [FN] Th[e trial] court routinely authorizes almost every request for Zoom testimony in custody cases, especially, as in this case, where there is the prospect of economic hardship flowing from travel over a considerable distance from out of state. In other words, there was absolutely no reason for Paternal Grandmother not to be presented to testify [at the Custody Trial]. Language giving a blanket authorization for Zoom testimony for any witness other than a parent or child is contained in the [Scheduling O]rder.

Trial Court Opinion, 11/12/24, at 16-17 (citations added; footnote in original).

(11) The proximity of the residences of the parties.

The trial court stated this factor "favors Mother moderately and the court gives it minimal weight. The court used minimal weight for this factor since the effect of this factor in the ultimate decision of the court is *de minimis* given the overwhelming effects of other factors." *Id.* at 17-18. Specifically, the court reasoned that

> Mother lives in York County. Father's address is uncertain. Father [offered] testimony that he lives with Paternal Grandmother in South Carolina. However, Father did not make Paternal Grandmother available for testimony. Additionally, when Mother [traveled to South Carolina for] … a custody pick up, Child was not at the address [Father] provided. The only sense that the [trial] court has[] of the situation is that Father lives far enough away that custody exchanges are not simple and he lives somewhere reasonably accessible to the Charlotte, North Carolina airport,

- 34 -

though whether his actual residence is in North Carolina, South Carolina, or Georgia is unclear. Father is the one who elected to move [away from York County], so this is a problem of his own making.

*Id.* at 17 (capitalization modified).

(12) Each party's availability to care for the Child or ability to make appropriate childcare arrangements.

The trial court found "[t]his factor favors Mother moderately and the court gives it slight weight." *Id.* at 18.

Mother testified as to her childcare and availability. [*See* N.T., 10/30/24, at 24-33.] The [trial court's] impression is that Mother is generally there for Child and can lean on her family when she cannot [care for Child]. Father did not present testimony on this matter. Credible testimony from … [D]eputy [Starnes] … was that an adult at the [South Carolina] residence Father claimed [was his residence] did not know anything about a child, [N.T., 10/18/24, at 56,] and Paternal Grandmother, who allegedly lives there, was not offered as a witness [at the Custody Trial]. All that said, Child is of an age[, *i.e.*, 13,] where child care is less significant as a factor generally.

Trial Court Opinion, 11/12/24, at 18 (citations added).

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.

The trial court found "[t]**his factor favors Mother overwhelmingly and the court gives it overwhelming weight.**" *Id.* at 19 (emphasis added). The court reasoned in support as follows:

**The court sees an extraordinary level of conflict between the parties.** Father claims that Mother is making him out to be a "super villain" to her extended family. Of course, when one smashes another human being's face, causing $5,000.00 of damage and damaging it to the point that she has to wear a [face] mask to conceal it from the parties' mutual child, it probably does not stake the best claim to heroism….

Mother claims that Father has been working to undermine her and alienate her from Child. [**See**, **e.g.**, N.T., 10/30/24, at 80-82, 96-97, 104-06, 119-21, 124.] Father claimed that he was not "here to bash [Child's] mom" [**id.** at 221,] but the [trial] court has been presented with a very different picture of Father's behavior. **The fact that Father is bringing Child into the conflict is incredibly concerning to the court.** Custody trials naturally have conflict between the parties, as they would otherwise not be brought to trial. Even so, parties should endeavor to be civil and to do their best to ensure that the conflict between them is not impacting a child. Mother related how she does her best to keep custody matters and conflict with Father away from Child. **The court finds Mother credible and believes she has gone beyond what most parties attempt in order to insulate Child from conflict. Meanwhile[,] it is clear that Father is involving Child deeply in this custody matter.** The fact that Child is being made [] aware of the custody situation, enough to even have expectations as to the outcome, is worrying.

Trial Court Opinion, 11/12/24, at 18-19 (emphasis and citations added).

(14) The history of drug or alcohol abuse of a party or a member of a party's household.

The trial court found this factor was neutral and assigned it "minimal weight." **Id.** at 20. The court recognized that "Mother testified that Father is drinking alcohol, but there was not much else offered to back up that point. The court does not have much to dwell upon in this factor and it will not impact the case here." **Id.** at 19-20.

(15) The mental and physical condition of a party or member of a party's household.

The trial court found this factor "favors Mother moderately and the court gives it moderate weight." **Id.** at 20. The court explained that it

did not hear much regarding concerns with Mother's physical or mental condition. Nothing was relayed to the court regarding Father's physical condition. The court has concerns with Father[,] consistent with [the court's] analysis of the prior [custody] factors, namely that Father appears to be violent and manipulative. Father's actions do not portray him as being a mentally healthy individual, though no formal diagnosis was presented.

*Id.*

(16) Any other relevant factor.

The trial court found that this factor "favors neither party," and clarified that "the court did not find it necessary to consider any other issues." *Id.*

**ANALYSIS/CONCLUSION**

Our review confirms the trial court's findings are supported by competent evidence in the record. As the foregoing illustrates, the trial court thoroughly analyzed each of the custody factors and appropriately gave substantial weighted consideration to the factors that implicated Child's safety, each of which favored Mother. *See* Trial Court Opinion, 11/12/24, at 5-7. The record belies Father's claim that the trial court failed to appropriately consider Child's stated preference and relationships with Child's siblings. *See id.* at 11-13; Trial Court Opinion, 12/30/24, at 30. Although the trial court found that the custody factor regarding Child's preference favored Father and gave this factor "moderate weight," Trial Court Opinion, 11/12/24, at 13, it was but one factor, and was substantially outweighed by the remaining custody factors, many of which strongly favored Mother. We decline Father's invitation to reweigh the custody factors or second-guess the trial court's

findings. *See R.M.G.*, 986 A.2d at 1237 ("[t]he parties cannot dictate the amount of weight the trial court places on evidence."); *B.S.G.*, 255 A.3d at 533 ("the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." (citation omitted)).

Based on the foregoing, we discern no gross abuse of the trial court's ample discretion in its custody ruling, which promotes Child's best interests. Father's first two issues merit no relief.

In his third issue, Father argues the trial court violated his substantive due process rights by including in the Custody Order the communication restriction, "without credible or substantial evidence to justify such restriction[]." Father's Brief at 9 (unpaginated) (capitalization modified); *see also* Custody Order, 11/15/24, at 5-6 (describing the communication restriction). According to Father,

> the record reflects that [] Mother has actively blocked communication between [] Father and Child since January 2024. Rather than addressing this ongoing interference, the [trial] court instead granted [] Mother sole control over contact, imposing supervised phone calls and visitation based exclusively on [] Mother's uncorroborated testimony. This restriction not only lacks evidentiary support but also serves to further alienate [] Father, effectively stripping him of his fundamental parental rights without justification.

Father's Brief at 9 (unpaginated) (capitalization modified); *see also id.* at 10 (unpaginated) (Father asserting the trial court improperly imposed the

communication restriction "[w]ithout substantial evidence of harm or risk" to Child). Father maintains that the communication restriction

> was not imposed in response to any verified misconduct on the part of [] Father, but rather[,] based on [] Mother's assertions alone, despite clear evidence that she has engaged in a pattern of parental alienation.

*Id.* at 10 (unpaginated) (capitalization modified).

"A question regarding whether a due process violation occurred is a question of law for which the standard of review is *de novo* and the scope of review is plenary." **S.T. v. R.W.**, 192 A.3d 1155, 1160 (Pa. Super. 2018) (citation omitted). The Due Process Clause of the Fourteenth Amendment to the United States Constitution "includes a substantive component" that protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." **Troxel v. Granville**, 530 U.S. 57, 65, 66 (2000); *see also* **S.T.**, 192 A.3d at 1161 (same).

A trial court has the authority to impose reasonable restrictions on child custody awards. **Ferencak v. Moore**, 445 A.2d 1282, 1286-87 (Pa. Super. 1982); *see also* **E.B.**, 209 A.3d at 467 ("In custody proceedings, the paramount concern is the welfare of the children; all other considerations, including the rights of the parents, are subordinate to the children's physical, intellectual, moral, spiritual, and emotional well[]being." (citation and brackets omitted)). To impose restrictions in a custody order, a trial court must make a finding that, without such restriction, a child will be adversely affected by the custodial award. **J.R.M. v. J.E.A.**, 33 A.3d 647, 653 (Pa.

Super. 2011). A party seeking restrictions on partial custody "must show that the restriction is necessary to avoid detrimental impact on the child[,] and that the content of the restriction manifests a reasonable relationship between the restriction and the avoidance of detrimental impact." *Fatemi v. Fatemi*, 489 A.2d 798, 802 (Pa. Super. 1985) (citation omitted).

> [T]o avoid unduly impinging upon a parent-child relationship, a court must sparingly impose restrictions on the relationship, … and must furthermore impose the least intrusive restriction(s) reasonably necessary to assure the child's welfare.

*Id.*

Instantly, the trial court competently addressed and rejected Father's due process challenge in its Rule 1925(a) opinion. *See* Trial Court Opinion, 12/30/24, at 14-17. Specifically, the trial court found that absent the reasonable communication restriction, Child's best interests would be harmed by Father's pattern of misconduct and parental alienation. *See id.* at 16 ("To evade Mother's justifiable and reasonable efforts to place reasonable restrictions on harmful communications the [C]hild has had with Father, [Father] has used various means of other communications to reach the [C]hild. [Father] is completely untrustworthy when it comes to co-parenting in a responsible manner."). We agree with the trial court's analysis and

conclusion, which is supported by the record and the law, and affirm on this basis in rejecting Father's third issue. *See id.* at 14-17.[24]

In his fourth issue, Father maintains "the trial court improperly relied on an unresolved abuse allegation [by Mother] against Father from 2022, disregarding the fact that the matter had already been tried and resulted in a hung jury[.]" Father's Brief at 11 (unpaginated) (emphasis omitted). According to Father, he "has never been convicted of any abuse, has never exhibited any violent behavior toward the [C]hild, and has had no contact with Mother for nearly three years." *Id.* (emphasis omitted).

The trial court rejected Father's claim in its Rule 1925(a) opinion. *See* Trial Court Opinion, 12/30/24, at 42-44. Relevantly, the court determined it properly considered "Mother's testimony about the physical violence she experienced at the hands of Father[,]" and correctly observed that the custody factors, post-Kayden's Law, "now place[] an increased focus and significance on an expanded universe of abuse in the context of custody cases." *Id.* at 42; *see also id.* at 44 ("The existence of unproved … criminal charges was wholly unnecessary to reach the [trial] court's conclusion."). As we agree with the trial court's analysis set forth in its opinion, which is supported by the law

---

[24] We direct the parties to attach a copy of the trial court's December 30, 2024, opinion in the event of further proceedings.

and the record, we affirm on this basis regarding Father's fourth issue.[25]  ***See***

***id.*** at 42-44; ***see also*** Trial Court Opinion, 9/13/24, at 3-4 ("No admissible

evidence of abuse was presented which was sufficiently credible to cause the

court to conclude that there was abuse of the [C]hild by Mother.  The [trial]

court did not find Father to be especially credible.  To the contrary[,] he was

evasive and did not respond to simple questions.  At times[,] he chose to be

argumentative." (citation omitted)).

In his fifth issue, Father contends the trial court exhibited judicial bias

and issued a partial and unfair Custody Order.  ***See*** Father's Brief at 12-15

(unpaginated).  Father argues,

> [t]he trial court exhibited clear bias and a lack of impartiality in
> its evaluation of the evidence and testimony, applying inconsistent
> standards to the parties.  The [trial court's] unequal treatment of
> [] Father, dismissive attitude toward his testimony, and
> preference for [] Mother's claims[,] without scrutiny[,] amount[s]
> to an abuse of discretion and a violation of due process.

***Id.*** at 12 (unpaginated) (capitalization modified).  According to Father, when

he testified at the Custody Trial "in direct response to [M]other's accusations,"

the trial court "exhibited clear frustration, repeatedly cutting [Father] off…."

***Id.*** at 13 (unpaginated).  Father contends that the trial court's favoritism was

exhibited by its "one-sided credibility assessment" in favor of Mother.  ***Id.*** at

_____

[25] Furthermore, we decline Father's invitation to disturb the trial court's
credibility determinations, including its finding that Father had abused Mother,
which are supported by the record and binding on this Court.  ***McGee***, 2025
PA Super 52, at 1.

15 (unpaginated); *see also id.* (complaining that "Mother's unsupported claims were accepted as fact, while substantial testimony from [] Father and Child was dismissed outright." (capitalization modified)).

This Court has recognized that

[i]t is beyond dispute that a party to an action has the right to request the recusal of a jurist where that party has a reason to question the impartiality of the jurist in the cause before the court. However, **a mere recitation of unfavorable rulings … does not satisfy the burden of proving judicial bias**, prejudice or unfairness. *Feingold v. Hill*, … 521 A.2d 33 ([Pa. Super.] 1987), *allocatur denied*, 515 Pa. 607, 529 A.2d 1081 (1987).

*Ware v. U.S. Fid. & Guar. Co.*, 577 A.2d 902, 904 (Pa. Super. 1990) (internal quotation marks omitted; emphasis added).[26]

Instantly, the trial court rejected Father's claim of judicial bias in its Rule 1925(a) opinion. *See* Trial Court Opinion, 12/30/24, at 22-24. In short, the trial court concluded that "[f]undamentally, [Father] at all times had a fair, impartial, and unbiased trial. …. Bias was not a factor[.]" *Id.* at 24; *see also id.* at 19-20 ("The bottom line in this case is that it was a relatively non-complex custody trial. …. Father had ample time to put on testimony about custody factors but he spent a considerable amount of it on marginally

---

[26] "Moreover, a party seeking recusal or disqualification must raise the objection at the earliest possible moment, or that party will suffer the consequence of being time barred." *Ware*, 577 A.2d at 904 (citations omitted). Instantly, Father preserved below a recusal request, and his claim of the trial court's bias. *See generally* Motion to Change Venue, 7/2/24; *see also* Order, 7/23/24 (trial court denying Father's *pro se* Motion to Change Venue).

relevant or collateral matters."). As the trial court's analysis and conclusion is supported by the record, which belies Father's claim of judicial bias, we affirm based on the trial court's opinion with respect to Father's fifth issue. *See id.* at 22-24; *see also Ware*, 577 A.2d at 904 (stating an appellant's "mere recitation of unfavorable rulings … does not satisfy the burden of proving judicial bias[.]").

We address Father's sixth and seventh issues together, as each challenges the trial court's admission into evidence certain text messages involving Child. In his sixth issue, Father argues the trial court improperly admitted at the Custody Trial, over his objection, numerous text messages Child sent to Father, which Mother had retrieved from Child's cell phone.[27] *See* Father's Brief at 15-18 (unpaginated). According to Father, Mother improperly "gained unauthorized access to the [C]hild's phone without first seeking consent from [Father], who is the account holder." *Id.* at 16 (unpaginated).

_____

[27] At the beginning of the second day of the Custody Trial, Father belatedly objected to the admission of Child's text messages, claiming they were inadmissible pursuant to the Pennsylvania Wiretapping and Electronic Surveillance Control Act (Wiretap Act), 18 Pa.C.S.A. §§ 5701-5782. N.T., 10/30/24, at 5; *see also Amato v. Bell & Gossett*, 116 A.3d 607, 625 (Pa. Super. 2015) (stating that in order to preserve a challenge to the admission of evidence on appeal, "a party must lodge a timely objection [at trial]. Failure to raise such objection results in waiver of the underlying issue on appeal." (internal citations omitted)). The trial court overruled Father's untimely objection, reasoning that the text messages are "not covered by Wiretap Act[.]" *Id.*

The trial court erroneously admitted text messages that were illegally obtained by [] Mother without [Father's] consent, in direct violation of the Federal Wiretap Act (18 U.S.C. § 2511) and the Pennsylvania Wiretap[] [Act.]

*Id.* at 15 (unpaginated) (capitalization modified).

In his seventh issue, Father argues the trial court abused its discretion in sustaining Mother's objection, at the Pretrial Hearing, to the admissibility of certain text messages Father proffered involving Child. *See* Father's Brief at 23-25 (unpaginated). Father complains these text messages, "including messages between [] Father, Child, and [Child's] siblings," were "then used against [] Father, leading to a contempt finding and court-imposed sanctions." *Id.* at 23 (capitalization modified). In connection with this issue, Father again repeats his claims of 1) judicial bias, *id.* at 23-25; and 2) a Wiretap Act violation. *Id.* at 25.

Our standard of review for a ruling on the admission or exclusion of evidence is for an abuse of discretion. *Wilson v. Smyers*, 284 A.3d 509, 514 (Pa. Super. 2022).

Father's seventh issue implicates the trial court's evidentiary ruling related to hearsay. Under the Pennsylvania Rules of Evidence, hearsay evidence is incompetent and inadmissible unless it meets an exception set forth in the Rules or one prescribed by this Court or statute." *In re I.R.-R.*, 208 A.3d 514, 519 (Pa. Super. 2019) (citation omitted); Pa.R.E. 802 (rule against hearsay). "[T]he Pennsylvania Rules of Evidence define 'hearsay' as an out of court statement offered in court for the truth of the matter asserted."

*Carlini v. Glenn O. Hawbaker, Inc.*, 219 A.3d 629, 640 (Pa. Super. 2019);

*see also* Pa.R.E. 801(c).

> With respect to the Wiretap Act, this Court has explained that it
>
> "emphasizes the protection of privacy" in wire, oral, and electronic communications, including telephone calls. *Commonwealth v. Spangler*, 809 A.2d 234, 237 (Pa. 2002). The [Wiretap] Act generally prohibits both **recording** a telephone call and disclosing the contents of an unlawfully **recorded** call. 18 Pa.C.S.A. §§ 5702, 5703; *see*, *e.g.*, *Commonwealth v. Deck*, 954 A.2d 603 (Pa. Super. 2008).

*Commonwealth v. Markos*, 331 A.3d 38, 41 (Pa. Super. 2025) (citations modified, emphasis added); *see also Commonwealth v. Glass*, 200 A.3d 477, 483 (Pa. Super. 2018) (explaining that the Wiretap Act "is a pervasive scheme of legislation which suspends an individual's constitutional rights to privacy only for the limited purpose of permitting law enforcement officials, upon a showing of probable cause, to gather evidence necessary to bring about a criminal prosecution and conviction." (citation omitted)).

Instantly, in its Rule 1925(a) opinion, the trial court rejected Father's claims of its improper evidentiary rulings related to the text messages and his claim of a Wiretap Act violation. *See* Trial Court Opinion, 12/30/24, at 18-19, 28. As we agree with the trial court's analysis and conclusion, which is supported by the law and the record, we affirm on this basis with respect to Father's sixth and seventh issues. *See id.*

In his eighth issue, Father claims he was deprived of procedural due process, where "the motion[s] court[28] conducted a special relief hearing[29] prior to [the Custody T]rial without providing [Father] with notice or an opportunity to be heard…." Father's Brief at 18 (unpaginated) (footnotes added). Father complains that following the motions court hearing, Judge Menges

> granted [] Mother's request for special relief, imposing severe restrictions on [] Father's communication[s] with the Child and the Child's siblings[,] without affording [] Father any opportunity to contest the allegations or present evidence in his defense. [Father] was entirely unaware of the proceedings until he later received the order granting [] Mother's [petition for special] relief, effectively stripping [Father] of his parental rights without due process.

*Id.* at 19 (capitalization modified; citation to record omitted).

"[D]ue process is required during custody proceedings." *E.B.*, 209 A.3d at 463. This Court has stated that

_____

[28] As the trial court explained in its Rule 1925(a) opinion, Father's eighth issue is "related to a prior proceeding in front of Judge N. Christopher Menges[ (Judge Menges),] which occurred on or about August 27, 2024 [(motions court hearing)], as well as activity related to a family motions court proceeding held by Judge Menges on or about July 24, 2024[.]" Trial Court Opinion, 12/30/24, at 1-2.

[29] On August 21, 2024, Mother filed a petition for special relief seeking, *inter alia*, an order modifying Father's physical custody periods to be supervised, and prohibiting Father from encouraging or permitting Child to have unsupervised contact with Child's siblings. Petition for Special Relief, 8/21/24, at 3; *see also* Pa.R.C.P. 1915.13 (governing special relief in child custody actions). Mother alleged that Father, in concert with Child's siblings, was inappropriately interfering with Mother's custody and alienating Child from her. *Id.* at 2-3. Judge Menges granted Mother's petition for special relief on August 27, 2024.

[d]ue process must be afforded to parents to safeguard [their] constitutional rights. Formal notice and an opportunity to be heard are fundamental components of due process when a person may be deprived in a legal proceeding of a liberty interest, such as physical freedom, or a parent's custody of [his or] her child. It is well settled that procedural due process requires, at its core, adequate notice, opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case. Due process is flexible and calls for such procedural protections as the situation demands.

*S.T.*, 192 A.3d at 1161 (internal citations, emphasis, and quotation marks omitted).

Instantly, the trial court rejected Father's claim of a procedural due process violation in its Rule 1925(a) opinion, concluding Father had adequate notice of the motions court hearing. *See* Trial Court Opinion, 12/30/24, at 5-6. As we agree with the trial court's analysis and conclusion, which is supported by the record, we affirm on this basis with respect to Father's eighth issue. *See id.*

In his ninth issue, Father claims the trial court improperly "detained [Father] at a pretrial hearing without properly considering [Father's] credible allegations of [Mother's] abuse [of Child], in violation of Pennsylvania law and fundamental due process protections." Father's Brief at 20 (unpaginated); *see also id.* at 21-22 (unpaginated) ("Instead of investigating [Father's] serious claims, the trial court disregarded the Child's repeated statements [about Mother's abuse] and punished [] Father for trying to ensure the Child's safety[.]" (capitalization modified)). According to Father,

- 48 -

the most egregious aspect of the trial court's decision was that it delegated judicial authority to [] Mother's attorney, granting her sole discretion over when [] Father could be released from detention. The court ruled that [] Father would only be released once [] Mother's attorney confirmed that the Child had been returned—an act that effectively placed [] Father's freedom under the control of opposing counsel, a clear violation of due process.

*Id.* at 21 (unpaginated) (capitalization modified).

The trial court rejected Father's claim in its Rule 1925(a) opinion, and determined it 1) did not improperly delegate judicial authority to Mother's attorney or deprive Father of due process; and 2) considered Father's allegation that Mother had abused Child, but found this allegation incredible. *See* Trial Court Opinion, 12/30/24, at 13-14, 25, 31-32; *see also* Trial Court Opinion, 11/12/24, at 5 (finding that the testimony of Father and his witnesses regarding Mother's purported physical abuse of Child "was not credible … and was not backed up by evidence to place [Mother's] alleged conduct so far as to be abusive."). As we agree with the trial court's analysis and conclusion, which is supported by the record and the law, we affirm on this basis with respect to Father's ninth issue. *See* Trial Court Opinion, 12/30/24, at 13-14, 25, 31-32; *see also McGee*, 2025 PA Super 52, at 1 ("We defer to the trial judge regarding credibility and the weight of the evidence.").

In his tenth, and final preserved issue, Father contends the trial court abused its discretion in admitting into evidence, at the Pretrial Hearing, certain receipts that Mother had submitted to establish her expenses incurred, in connection with her travel costs related to retrieving Child from Father's

custody, and Mother's petitions for contempt.  *See* Father's Brief at 25-28

(unpaginated). Father argues

> [t]he trial court erroneously admitted unverified receipts without proper authentication, in direct violation of Pennsylvania Rule of Evidence 901 (Pa.R.E. 901), which requires that all documentary evidence be authenticated as a condition of admissibility.  The failure to properly verify these receipts before using them as the basis for a financial order against [Father] constitutes a violation of procedural due process.

*Id.* at 25-26.

Pennsylvania Rule of Evidence 901 mandates that, "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Pa.R.E. 901(a); *see also Commonwealth v. Kurtz*, 294 A.3d 509, 527 n.12 (Pa. Super. 2023) (recognizing that authentication pursuant to Rule 901(a) "generally entails **a relatively low burden of proof**" (emphasis added)).  "Testimony of a witness with personal knowledge that a matter is what it is claimed to be may be sufficient to authenticate or identify the evidence."  *In re P.P.*, 878 A.2d 91, 94 (Pa. Super. 2005) (citing Pa.R.E. 901(b)(1)).  We have recognized that "[a] document may be authenticated by direct proof and/or by circumstantial evidence.  Proof of any circumstances which will support a finding that the writing is genuine will suffice to authenticate the writing."  *In re P.P.*, 878 A.2d at 94 (internal citations and quotation marks omitted).

Instantly, the trial court rejected Father's challenge to the authenticity of Mother's proffered receipts in its Rule 1925(a) opinion. ***See*** Trial Court Opinion, 12/30/24, at 26-27. We agree with the trial court's stated analysis and conclusion, which is supported by the law and the record, and thus affirm on this basis regarding Father's tenth issue. ***See id.***

Based on the foregoing, as we discern no gross abuse of the trial court's discretion or any error of law, we affirm the Custody Order.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>04/29/2025</u>